Diane Aqui, SBN 217087
Justin D. Hein, SBN 249275
jhein@smithdollar.com
SMITH DOLLAR PC
Attorneys at Law
418 B Street, Fourth Floor
Santa Rosa, California 95401
Telephone: (707) 522-1100
Facsimile: (707) 522-1101

Attorneys for Plaintiff
PAWEL ROGOCZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAWEL ROGOCZ,<br><br>Plaintiff,<br>v.<br><br>MICROSOFT CORPORATION, and DOES 1 through 25, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**VERIFIED COMPLAINT FOR DAMAGES**<br><br>**1) VIOLATION OF PUBLIC POLICY – WRONGFUL TERMINATION**<br>**2) BREACH OF CONTRACT**<br>**3) FALSE PROMISE**<br>**4) INTENTIONAL MISREPRESENTATION**<br>**5) NEGLIGENT MISREPRESENTATION**<br>**6) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**7) DEFAMATION**<br>**8) NEGLIGENT SUPERVISION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff PAWEL ROGOCZ ("Plaintiff") alleges as follows:

**PARTIES**

1. Plaintiff is a resident of California and a citizen of the United States, with a date of birth of May 17, 1967. Plaintiff was employed by Microsoft Corporation. From July 11, 2016 through September 4, 2017, Plaintiff was employed by Defendant as a Principal Site Reliability Engineer.

2. Defendant, MICROSOFT CORPORATION, is a corporation organized under the laws of the state of Washington, with its principal place of business in Redmond, Washington. Microsoft does business in California and throughout the world.

3. Plaintiff is ignorant of the true names and capacities of those Defendants named as DOES 1 through 25 (hereafter "DOE Defendants"), and for that reason has sued these Defendants by fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is in some way liable and legally responsible for the damages and injuries set forth in this Complaint. Plaintiff will seek leave of the Court to amend this Complaint to identify these Defendants when their identities are ascertained.

**JURISDICTION AND VENUE**

4. This action arises under the laws of the state of California and United States.

5. Subject-matter jurisdiction is conferred by 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

6. This Court has jurisdiction over each Defendant named in this complaint because each Defendant is a person or entity who is either domiciled in California or has sufficient minimum contacts with California so as to render the exercise of jurisdiction by this Court reasonable and just, according to our nation's traditional conception of fair play and substantial justice.

7. Venue is proper in this Court because Defendants transact business within this district.

8. The relief the Plaintiff seeks is within the jurisdictional limits of the Court.

**FACTS COMMON TO ALL CLAIMS**

9. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

10. Plaintiff was recruited by Defendant in the early summer of 2016 to be Principal Service Engineer (level 65), part of the Dynamics 365 division, with the intent of driving efforts to improve the reliability of the website, Dynamics 365.

11. The hiring manager was Dennis Ardiente, who reported to Ben Schultz. Plaintiff spoke to both of them during the recruitment and interview process, which took place while Plaintiff resided in San Jose, California.

12. Plaintiff also had a telephone conversation with Scott Thompson, General Manager, who reported to Jujhar Singh, Corporate Vice President.

13. Plaintiff was offered the position and relocation package from San Jose, California to reside and work near Defendant's corporate office in Bellevue, Washington.

14. The offer letter spelled out the importance of Plaintiff's role as a long-term employment position and lucrative compensation package to draw his interest. Specifically, it communicated consideration of a signing bonus of $50,000, an annual base salary of $190,000, stock compensation, and an annual incentive bonus of up to 40% of the base salary ("consideration.")

15. Plaintiff accepted the job offer in exchange for the consideration. Plaintiff justifiably relocated himself and his personal property to Bellevue, Washington, and invested in starting a new life in Washington in reliance of the consideration.

16. Plaintiff is informed and believes, and hereon alleges, that Defendant never intended to follow through on providing Plaintiff the full consideration. Specifically, Defendant never intended to provide Plaintiff with an annual incentive. Moreover, Defendant never intended to provide Plaintiff with a long-term employment position, but rather wanted Plaintiff's skills to temporarily address a problem that they were having with determining the reliability of their website, Dynamics 365.

17. Plaintiff's first day of work was July 11, 2016.

18. In or around September 2016, Mr. Ardiente's superior changed from Mr. Schultz to Bill Burton.

19. When Plaintiff started his position, Mr. Ardiente sought to improve the reliability of the Defendant's Dynamics 365 website, as Defendant did not have any reliable metrics indicating availability. This was despite publicly indicating and marketing the site otherwise. Specifically, service on the site would go down frequently, whereas the Service Level Agreement required 99.9% reliability. If not met, it required customer refunds—50% to 100%—according to the contract with the customer.

20. By October 2016, Plaintiff built a solution to establish these metrics. Specifically,



Plaintiff built a solution that permitted Defendant to view the availability of the site in real time. Mr. Ardiente reviewed Plaintiff's work and found the metrics were consistent and reflective of the availability of the site.

21. The metrics demonstrated that the availability of the website was far below the reliability required under the Service Level Agreements. Specifically, the metrics demonstrated 95% to 97% reliability.

22. Mr. Ardiente shared the metrics with others—including his superiors—at Defendant. Shortly thereafter, Mr. Ardiente was transferred to a different unit with Defendant. Mr. Ardiente left a positive performance review for Plaintiff at the time of his departure.

23. As a result of Mr. Ardiente's departure, Plaintiff then reported directly to Mr. Burton. In or around March 2, 2017, Mr. Burton became the acting General Manager, reporting directly to Mr. Singh.

24. In this new capacity, Mr. Burton engaged in the policy of avoidance of any discussions on subjects affecting the quality of provided service to the customers. When introducing himself as the new GM, Mr. Burton's presentation to the entire team included the statement, "Attitude is more important than facts."

25. As Plaintiff's job and project was based upon identifying objective measurements, Plaintiff had immediate concerns with potential conflict with Mr. Burton and that objective measurements were not going to be the basis of his decision-making.

26. Plaintiff's concern was that such was disingenuous to Defendant's customers. Basically, Defendant was offering, marketing, and selling a stated level of service to its customers, while not having any measurable data that reflected that level of service.

27. Plaintiff's concern was exacerbated by the fact that Defendant's Service Level Agreement ("SLA") shifted the burden of satisfying the promised level of service to the customers. Specifically, the SLA forced its customers to report quality issues on an incident-by-incident basis to Defendant, who would then investigate and determine whether a refund was due to the customer given that the level of service had not been met. A number of these customers were, in fact, government agencies—federal agencies, state agencies, local or municipal government—that could



subject Defendant to prosecution for fraud or false claims.

28. Plaintiff tried to bring these concerns to Mr. Burton's attention, but Mr. Burton would not engage and appeared to avoid meetings with Plaintiff, especially in-person meetings with third parties present. On one occasion, Mr. Burton informed Plaintiff approximately two hours before a meeting with a Partner-level Manager—a meeting Plaintiff had taken two months to coordinate and schedule—that he would not be attending or participating in the meeting. Plaintiff was also not included in his staff meetings.

29. In one instance, Plaintiff discovered that Mr. Singh was making comments during a division's all-hands meeting about the quality of service of the Dynamics 365 website being Plaintiff's division's primary focus. When Plaintiff relayed this statement to Mr. Burton, Mr. Burton responded, "the words of executives of this level should not be taken literally" effectively sabotaging efforts of his own manager.

30. Plaintiff is informed and believes that Mr. Burton held a grudge against Plaintiff for being a former employee of Google. Plaintiff would often compare the quality of the products being offered by the two companies as a way to demonstrate that Defendant's product was lacking. Mr. Burton would dispute those contentions, to a point where Plaintiff started to doubt that Defendant had any concern with quality of service for its customers.

31. Plaintiff did have one-to-one in-person meetings with Mr. Burton. Specifically, Mr. Burton never indicated Plaintiff should stop working on the project Plaintiff was hired for, and actually encouraged Plaintiff to continue as a number of interesting things were discovered which allowed the company to avoid bigger problems. For example, Plaintiff's solution discovered that one of Defendant's customers was responsible for 40% of the overall traffic in Europe at some point and the percentage of traffic created by this customer was growing. The issue was fixed but the details were never made available to Plaintiff. Any attempts to get any details from Mr. Burton were met with silence or "I don't know."

32. In December 2016, Mr. Singh sent a monthly report to Defendant's employees at a principal level and above, containing metrics on the website and claiming almost perfect availability. In response, Plaintiff contacted Mr. Burton via email correspondence and asked him



whether and when Defendant planned to use Plaintiff's developed metrics to inform Senior Leadership Team in order to prioritize closing the gap between reality and what was being reported as the site's availability. Mr. Burton responded that the reporting is standardized across the entire Office 365 division based on availability incidents.

33. In February 2017, Defendant had a Human Resources meeting with Plaintiff and other members in his department regarding the present status of the department. At this point, the Human Resources representative, Andrea DeYoung, asked Plaintiff, "have you given up on us already?" In response, Plaintiff assured Ms. DeYoung that he had not, he had not even been at work 1 year, and that it would be premature given the level of disruption of the division's leadership. Ms. DeYoung identified additional resources Plaintiff and his division could incorporate into their efforts—specifically a separate unit, Product Architecture.

34. Plaintiff then met with his direct supervisor, Mr. Burton, after the meeting and they conferred and discussed the idea of working with Product Architecture to deal with their focus of improving the availability of the site. Ultimately, Mr. Burton agreed and endorsed such an effort.

35. Immediately, Plaintiff reached out and began to interact with the unit. By May 2017, Plaintiff was actively working in concert with the Product Architecture unit. By June 2017, Plaintiff was actively engaged with one of the key people—Mahesh Sreenivas—who was working with Plaintiff on projects driving availability of the site.

36. Thereafter, Plaintiff tried to get a meeting with Scott Guttrie, the Executive Vice President who Mr. Singh reported to. Plaintiff had initiated this effort in April 2017, that was denied and declined by Mr. Burton, but never reported back to Plaintiff.

37. When Plaintiff, not knowing about the earlier decision, asked Mr. Guttrie's assistant about the prior April 2017 request, Plaintiff was told that Mr. Burton had denied and declined the meeting. Plaintiff then confronted Mr. Burton, who finally admitted what he had done and indicated that he felt the meeting was not necessary as the meeting would serve no useful purpose.

38. In or around January 2017, Defendant posted an external ethics complaint website—http://MicrosoftIntegrity.com—via dashboards placed next to elevators on every floor across the entire campus. This flew in the face of everything Plaintiff was observing in the department. Being



familiar that other companies use the ethics complaint line to fire people, Plaintiff sent email correspondence to Defendant's CEO on or around January 18, 2017 expressing wariness of the use of such a resource to constructively address problems Defendant was facing. The CEO responded to Plaintiff and included General Counsel and Executive Vice President Brad Smith to follow-up on Plaintiff's concern. Thereafter, Mr. Smith set-up an in-person meeting with Plaintiff to discuss.

39. In April 2017, that in-person meeting took place. Plaintiff met with Mr. Smith to discuss his concerns related to the promotion of Ethics Violation Hotline. The next week after the meeting the dashboards were replaced with something else.

40. During the conversation, Plaintiff indicated there might be issues within Dynamics 365 division, given the high turnover at the senior management level. Brad asked Plaintiff to come back in 6 months to let him know if things have changed as they were actively looking into the situation.

41. Defendant also engaged in an abusive behavior by gas-lighting Plaintiff and isolating Plaintiff from any decision-making processes.

42. Specifically, Mr. Burton included defamatory language in Plaintiff's most recent performance review in or around May 2017.Mr. Burton wrote, "He can come across as abrasive or haughty" - simply for asking for clarification when information presented was incomplete. For example, during one of the meetings, information presented indicated 1,000 new customers were being acquired per calendar day. Such a total was preposterous, and Plaintiff questioned how that information was calculated, pointing out that the company has only 50,000 customers. If it was true, the number of customers would have been much higher—exceeding the total in less than two calendar months. It was later explained to Plaintiff offline that 98% of the 1,000 number are part of the sales and QA efforts.

43. Despite the fact the company did not have any data to drive the decision making process, Mr. Burton was driving efforts to acquire additional software (ScaleArc) making the production environment more complex and harder to manage by the already overloaded team. Plaintiff openly objected to these efforts. In a subsequent meeting, in or around June 2017, Mr. Burton declared the project as already abandoned and not to be continued. Later the same day

during a meeting with one of the leaders of the Software Engineering team, Plaintiff learned the project is actually being reviewed in order to justify the already made purchase.

44. Mr. Singh's departure was announced in June 2017. Mr. Singh's employment would continue for two additional months. It was during this two month period of time that Mr. Singh was permitted to terminate employees he was overseeing. Ultimately, this included Plaintiff.

45. Despite Defendant's policy of making it quite difficult to terminate engineers, as the company was applying for thousands of foreign labor visas, Mr. Burton used a loophole in the current company policy which allowed managers to declare reorganization, resulting in an elimination of a single position. This resulted in Plaintiff's termination on or around July 6, 2017, with his last date of employment being September 4, 2017.

46. On or around August 31, 2017, Plaintiff was denied his annual bonus for 2017. Specifically, Plaintiff was to earn up to 40% of his annual salary as a separate form of compensation as Consideration. Despite meeting all known parameters for production in his position, being eligible under company policy for the 2017 year bonus, and having received no notice whatsoever of any production shortcoming, Defendant denied the bonus. Specifically, Defendant indicated, "Microsoft employees whose employment terminates after June 30, 2017 are eligible for FY17 Rewards, provided that they meet the eligibility requirements set forth in the Rewards program. In FY17, you were considered for rewards as part of the normal process but your business impact was insufficient to warrant any merit, bonus or stock rewards."

**FIRST CAUSE OF ACTION**

**Violation of Public Policy – Wrongful Termination**

47. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

48. Plaintiff was employed by Defendant. From July 11, 2016 through July 6, 2017, Plaintiff was employed by Defendant as a Principal Site Reliability Engineer for Defendant's website, Dynamics 365.

49. Defendant terminated Plaintiff's employment on or around July 6, 2017.

50. Defendant terminated Plaintiff's employment because Plaintiff determined and



expressed concern that Defendant was engaging in fraud and generating false claims for its customers. Specifically, Plaintiff created a system to determine the objective reliability of Defendant's website, Dynamics 365, and reported that data as being inconsistent with public statements made by Defendant and its agents. Moreover, a mechanism inserted into the SLAs with customers shifted the burden of maintaining and testing the reliability to the Defendant's customers, making Defendant's fraud and false claims undiscoverable. Plaintiff expressed concern about all of this to his supervisor, manager, and further up the chain of command, until Plaintiff was terminated.

51. As a direct, foreseeable, and proximate result of the unlawful actions of Defendant, Plaintiff was harmed.

52. These unlawful actions of Defendant were a substantial factor in causing Plaintiff's harm and for that reason Plaintiff should recover damages from it.

53. As a direct, foreseeable, and proximate result of the unlawful actions of Defendant, Plaintiff has suffered and continues to suffer substantial losses in earnings, equity and other employment benefits and has incurred other economic losses. Plaintiff lost his only source of income, was forced to relocate to California after making a considerable investment in relocating to Washington, and had justifiably relied on Defendant's lucrative compensation package as being an indication of a long-term employment.

54. As a further direct, foreseeable, and proximate result of the unlawful actions of Defendant, Plaintiff has suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

55. Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## SECOND CAUSE OF ACTION

### Breach of Contract

56. Plaintiff re-alleges and incorporates by reference the allegations contained in the



preceding paragraphs of this Complaint as though fully set forth herein.

57. Plaintiff and Defendant entered into a contract. Specifically, Defendant offered and Plaintiff accepted an employment contract with Defendant, whereby Plaintiff was to perform as Defendant's Principal Site Reliability Engineer for Defendant's website, Dynamics 365. And in exchange, Defendant was to pay Plaintiff consideration in the form of a signing bonus of $50,000, an annual base salary of $190,000, stock compensation, and an annual incentive bonus of up to 40% of the base salary ("consideration").

58. Plaintiff did all or substantially all of the significant things Plaintiff was to do as Defendant's Principal Site Reliability Engineer and as required as an employee of Defendant throughout 2016 and into 2017.

59. Defendant, however, failed to do something that the employment contract required, Specifically, Defendant breached the employment contract when it failed to pay Plaintiff an annual incentive bonus in 2016 or 2017.

60. On or around July 6, 2017, Defendant terminated Plaintiff's employment.

61. Thereafter, Defendant doubled-down on its breach and refused to pay Plaintiff his annual incentive bonus. Defendant informed Plaintiff of this decision on or around August 31, 2017.

62. As a direct, foreseeable, and proximate result of the unlawful breach of contract by Defendant, Plaintiff was harmed.

63. The unlawful breach of contract by Defendant was a substantial factor in causing Plaintiff's harm and for that reason Plaintiff should recover damages from it, in an amount of no less than $76,000 (40% of $190,000).

64. As a direct, foreseeable, and proximate result of the unlawful breach of contract by Defendant, Plaintiff has suffered and continues to suffer substantial losses in earnings, equity and other employment benefits and has incurred other economic losses. Plaintiff lost his only source of income, was forced to relocate to California after making a considerable investment in relocating to Washington, and had justifiably relied on Defendant's lucrative compensation package as being an indication of a long-term employment.

**THIRD CAUSE OF ACTION**

**False Promise**

65. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

66. Defendant made promises to Plaintiff. Specifically, Defendant promised Plaintiff a long term employment position with a compensation package that included an annual bonus.

67. These promises were made by Defendant at the time Plaintiff was living in the Silicon Valley, semi-retired and working on a project-basis with a number Defendant's competitors.

68. These promises were made to get Plaintiff to relocate, abandon his semi-retired status, and work for Defendant as opposed to being available to Defendant's competitors.

69. Defendant did not intend to perform this promise when it was made. Specifically, Defendant only intended to employ Plaintiff temporarily, soil his reputation, and never to pay Plaintiff a portion of its promised consideration.

70. Defendant did not inform Plaintiff of its intentions concerning getting him to leave his employment or not paying the full consideration.

71. Because of the continued encouragement, direction, and promises made by Defendant, Plaintiff reasonably relied upon the promise and accepted the employment offer.

72. Defendant did not perform the promised act. Specifically, Defendant terminated Plaintiff's employment within one year of hiring and did not pay the entire consideration that had been promised to Plaintiff.

73. Ultimately, Plaintiff was harmed. Specifically, Plaintiff incurred expenses in travel, relocation expenses, and lost wages, in an amount according to proof.

74. Furthermore, Plaintiff's lifestyle was disrupted. Moreover, Plaintiff's reputation was sullied. All of the goodwill Plaintiff had established in Silicon Valley was gone, and by working with Defendant for such a short period of time, he could no longer obtain the same project opportunities he had before.

75. As such, Plaintiff's reasonable reliance on Defendant's false promise was a substantial factor in causing Plaintiff's harm.



76. Plaintiff has been injured in an amount according to proof.

**FOURTH CAUSE OF ACTION**

**Intentional Misrepresentation**

77. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

78. Defendant represented to Plaintiff that a fact was true. Specifically, Defendant represented to Plaintiff that he would have a long term employment position with a compensation package that included an annual bonus with Defendant were he to accept its employment offer.

79. These representations were made by Defendant at the time Plaintiff was living in the Silicon Valley, semi-retired and working on a project-basis with a number Defendant's competitors.

80. These representations were false. Defendant did not intend to perform as it had stated. Specifically, Defendant only intended to employ Plaintiff temporarily, soil his reputation, and never to pay Plaintiff a portion of its promised consideration.

81. Defendant knew the representations were false when they were made.

82. Defendant never informed Plaintiff that the representations were false—when they were made or any time thereafter.

83. Because of the continued encouragement, direction, and promises made by Defendant, Plaintiff reasonably relied upon the representations and accepted the employment offer.

84. Ultimately, Plaintiff was harmed. Specifically, Plaintiff incurred expenses in travel, relocation expenses, and lost wages, in an amount according to proof.

85. Furthermore, Plaintiff's lifestyle was disrupted. Moreover, Plaintiff's reputation was sullied. All of the goodwill Plaintiff had established in Silicon Valley was gone, and by working with Defendant for such a short period of time, he could no longer obtain the same project opportunities he had before.

86. As such, Plaintiff's reasonable reliance on Defendant's misrepresentation was a substantial factor in causing Plaintiff's harm.

87. Plaintiff has been injured in an amount according to proof.

88. Moreover, Defendant committed the acts despicably, maliciously, fraudulently, and



oppressively, with the wrongful intention to harm Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights, safety, or property of Plaintiff and others. Specifically, it knew the time and resources Plaintiff committed to its effort to relocate, knew it had no intention to fulfill any promise made, knew it would also impair Plaintiff's ability to seek re-employment with his former employer, who was Defendant's rival. Thus, Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

89. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

90. Defendant represented to Plaintiff that a fact was true. Specifically, Defendant represented to Plaintiff that he would have a long term employment position with a compensation package that included an annual bonus with Defendant were he to accept its employment offer.

91. These representations were made by Defendant at the time Plaintiff was living in the Silicon Valley, semi-retired and working on a project-basis with a number Defendant's competitors.

92. These representations were false. Defendant did not intend to perform as it had stated. Specifically, Defendant only intended to employ Plaintiff temporarily, soil his reputation, and never to pay Plaintiff a portion of its promised consideration.

93. Defendant may have honestly believed that the representations were true, they had no reasonable grounds for believing the representation was true when the representation was made.

94. Defendant never informed Plaintiff that the representations were false—when they were made or any time thereafter.

95. Because of the continued encouragement, direction, and promises made by Defendant, Plaintiff reasonably relied upon the representations and accepted the employment offer.

96. Ultimately, Plaintiff was harmed. Specifically, Plaintiff incurred expenses in travel, relocation expenses, and lost wages, in an amount according to proof.

97. Furthermore, Plaintiff's lifestyle was disrupted. Moreover, Plaintiff's reputation was sullied. All of the goodwill Plaintiff had established in Silicon Valley was gone, and by working



with Defendant for such a short period of time, he could no longer obtain the same project opportunities he had before.

98. As such, Plaintiff's reasonable reliance on Defendant's misrepresentation was a substantial factor in causing Plaintiff's harm.

99. Plaintiff has been injured in an amount according to proof.

**SIXTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

100. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

101. Defendant engaged in outrageous conduct by terminating his employment, refusing to pay his accrued compensation, and defaming him to future employers.

102. The conduct by Defendant, Defendant's employees, and Defendant's vendors as set forth above was so extreme and outrageous that it exceeded the boundaries of human decency and was beyond the pale of conduct tolerated in a civilized society. This conduct was intended to cause severe emotional distress, or was done in reckless disregard of the probability of causing severe emotional distress, towards Plaintiff.

103. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

104. The Defendant's conduct, separately and collectively, was a substantial factor in causing Plaintiff's emotional distress, humiliation, shame, and embarrassment.

105. Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

///

///

SEVENTH CAUSE OF ACTION

**Defamation**

106. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

107. Since his wrongful termination from Defendant, Plaintiff has sought employment elsewhere.

108. Through the course of this search for employment, Plaintiff is informed and believes and hereon alleges that prospective employers have conducted an employment background check on Plaintiff.

109. As part of that employment background check on Plaintiff, prospective employers have inquired as to Plaintiff's employment with Defendant.

110. Defendant has responded to those inquiries by informing prospective employers that Plaintiff's employment with it ended in termination short of one year due to Plaintiff's "abrasive, haughty" attitude.

111. Prospective employers reasonably understood the statement to be about Plaintiff and his conduct as an employee with Defendant.

112. Prospective employers reasonably understood the statement to mean that Plaintiff's employment with Defendants was terminated due to misconduct by Plaintiff.

113. Prospective employers reasonably understood the statement to mean that Plaintiff's employment with Defendants ended shortly and negatively.

114. Prospective employers reasonably understood the statement to mean that Plaintiff was at a risk of repeating this alleged misconduct resulting in a short and negative employment.

115. Defendant failed to use reasonable care to determine the truth or falsity of the statement that Plaintiff's employment with Defendant was terminated due to Plaintiff's "abrasive, haughty" attitude. Specifically, all knew that the statement was false. All knew Plaintiff was terminated due to him expressing concern with Defendant's fraud and false claims to its customers.

116. As a direct, foreseeable, and proximate result of Defendant's statements, Plaintiff was harmed. Specifically, Plaintiff has been out-of-work for approximately 18-months as of the



time of filing this complaint, suffering damages in an amount according to proof.

117. Defendant's false statements were a substantial factor in causing Plaintiff's harm and for that reason Plaintiff should recover damages from it.

118. The conduct by Defendant, as set forth above, was so extreme and outrageous that it exceeded the boundaries of human decency and was beyond the pale of conduct tolerated in a civilized society. This conduct was intended to cause severe emotional distress, or was done in reckless disregard of the probability of causing severe emotional distress.

119. As a direct, foreseeable, and proximate result of the unlawful actions of Defendant, Plaintiff has suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

120. Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**EIGHTH CAUSE OF ACTION**

**Negligent Supervision**

121. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

122. Defendant supervised Mr. Burton and Mr. Singh, as employees to serve in management, human resources, and supervisory roles.

123. Mr. Burton and Mr. Singh were unfit and incompetent to perform the work for which they were hired. Specifically, each witnessed, perceived, and/or participated in the wrongful termination, defamation, and retaliation Plaintiff identifies and alleges herein. And none took any action to confront, stop, or prevent the conduct and environment from occurring. Furthermore, each participated in the decision to terminate Plaintiff's employment.

124. Defendant knew or should have known that Mr. Burton and Mr. Singh were unfit or incompetent to serve as managers, human resources, or supervisors of Defendant. Specifically,



Defendant did not properly train, test, or otherwise ensure that Mr. Burton or Mr. Singh would properly perceive, confront, stop, and/or prevent a hostile work environment or retaliation.

125. Defendant knew or should have known that this unfitness or incompetence of Mr. Burton and Mr. Singh created a particular risk to others. Specifically, it created the risk that one of Defendant's employees would suffer as a result of a hostile work environment or retaliation.

126. Plaintiff suffered as a result of a hostile work environment and retaliation.

127. As a direct, foreseeable, and proximate result of Defendant's negligent supervision, Plaintiff was harmed.

128. Defendant's negligent supervision was a substantial factor in causing Plaintiff's harm and for that reason Plaintiff should recover damages from it, in an amount according to proof.

129. The conduct by Defendant, its officers, managers, employees, and/or vendors as set forth above was so extreme and outrageous that it exceeded the boundaries of human decency and was beyond the pale of conduct tolerated in a civilized society. This conduct was intended to cause severe emotional distress, or was done in reckless disregard of the probability of causing severe emotional distress.

130. As a direct, foreseeable, and proximate result of the unlawful actions of Defendant, Plaintiff has suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

131. Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For general and compensatory damages, including but not limited to, lost back pay, bonuses, plus interest, lost fringe benefits and future lost earnings and fringe



benefits, lost equity, damages for emotional distress and pain and suffering, according to proof allowed by law;

2. For nominal damages;

3. For punitive damages, exemplary, and treble damages, as allowed by law;

4. For restitution and/or disgorgement;

5. For an award of prejudgment and post-judgment interest; and

6. For an award to Plaintiff of such other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 11, 2019

SMITH DOLLAR PC

By________________________________
Justin D. Hein
Attorneys for PAWEL ROGOCZ



**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Respectfully submitted,

Dated: November 11, 2019

SMITH DOLLAR PC

By_______________________
Justin D. Hein
Attorney for PAWEL ROGOCZ



# VERIFICATION

STATE OF CALIFORNIA, COUNTY OF SANTA CLARA

I, PAWEL ROGOCZ, am a Plaintiff in the above-entitled action. I have read the foregoing VERIFIED COMPLAINT FOR DAMAGES and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein stated on information and belief, and concerning those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: 11/7/2019

PAWEL ROGOCZ

